# IN THE COURT OF APPEALS OF IOWA

No. 20-1704
Filed August 4, 2021


IN RE THE MARRIAGE OF DANIELLE ECHO MILLER
AND ROCKY LEE MILLER II,

Upon the Petition of
DANIELLE ECHO MILLER, n/k/a DANIELLE RICHARDS,
        Petitioner-Appellant,

And Concerning
ROCKY LEE MILLER II,
        Respondent-Appellee.
_____


        Appeal from the Iowa District Court for Warren County, Richard B. Clogg,

Judge.


        The mother appeals the district court's denial of her petition to modify the

parties' dissolution decree to give her physical care of their child. **AFFIRMED AS**

**MODIFIED AND REMANDED.**


        Benjamin Folladori of Mayberry Law Firm, P.C., Urbandale, for appellant.

        Anjela A. Shutts and Jennifer B. Chavez-Rivera of Whitfield and Eddy, PLC,

Des Moines, for appellee.


        Considered by Vaitheswaran, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

Danielle Richards, formerly known as Danielle Miller, and Rocky Miller are the parents of J.M., who was born in 2011. Under the terms of the 2015 decree dissolving their marriage, the parents shared legal custody of the child and Rocky was given physical care. Danielle initiated this action in 2019, filing a petition to modify the decree. She claimed Rocky is no longer fit to provide physical care and she can provide superior parenting to J.M. Following a trial in 2020, the district court denied Danielle's petition to modify physical care but made some changes to the visitation schedule and Danielle's child-support obligation. Danielle appeals, arguing the district court (1) should have granted her petition to give her physical care of J.M. and (2) erred in calculating her child-support obligation because it wrongly imputed additional income to her. She asks for appellate attorney fees.

**I. Background Facts and Proceedings.**

Rocky and Danielle were married in 2006. Their marriage was dissolved by decree in 2015.[1] At the time of the dissolution, there was a pending child-in-need-of-assistance (CINA) case involving J.M., and the juvenile court had placed J.M. with Rocky. Danielle "reluctantly consent[ed]" to Rocky getting physical care of J.M. under the decree, and the parents shared joint legal custody. Originally, Danielle's parenting time with J.M. was as ordered by the juvenile court. After the conclusion of the CINA proceedings, the dissolution decree gave Danielle parenting time with J.M. on Monday, Wednesday, and Friday evening each week.

---

[1] Both parties appeared pro se at the dissolution of marriage hearing.

She also had parenting time Friday evening through Sunday evening on alternating weekends.

Danielle petitioned to modify the decree in July 2019. In support of her request, Danielle cited Rocky's move to West Des Moines. Because she was ordered to provide all transportation to and from her visits with J.M., her drive went from "four miles from [her]" at the time of the dissolution to living a distance that, "depending upon traffic, could be anywhere from 45-50 minutes to a little over an hour" away.[2] She also cited Rocky's "severe psychological issues" that caused him to be "involuntarily committed on occasions," the Iowa Department of Human Service's involvement due to J.M.'s considerable number of school tardies and absences, and past issues Rocky had with firearms.

At the agreement of the parents, J.M. was appointed an attorney. Through her attorney, J.M. filed a document entitled "requested relief," in which she made her preferences known to the court at the time of the modification trial in August 2020. J.M. asked that her parents be awarded joint physical care.[3] She also requested that both parents be ordered to attend individual therapy, to participate in her play therapy, and to communicate with each other through a co-parenting application on their phones.

Following a two-day trial, the district court denied Danielle's request to modify physical care. The court changed the visitation schedule to minimize handoffs between the parents and give Danielle another overnight, but it removed

---

[2] Danielle cited Rocky and J.M.'s move in her petition; the details about the increased distance were part of her testimony at the modification trial.

[3] Neither parent asked the court to consider joint physical care.

her weekly Monday evening visit. The court also increased Danielle's child-support obligation. Danielle appeals.

## II. Standard of Review.

"Petitions to modify the physical care provisions of a divorce decree lie in equity," so our review is de novo. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016). "Though we make our own findings of fact, we give weight to the district court's findings." *Id.*

## III. Discussion.

### A. Physical Care.

Danielle asked the court to modify the dissolution decree to give her physical care of J.M. "A party seeking modification of a dissolution decree must prove by a preponderance of the evidence a substantial change in circumstances occurred after the decree was entered." *Id.* "The changed circumstances affecting the welfare of the child[] and justifying modification of the decree 'must not have been contemplated by the court when the decree was entered, and they must be more or less permanent, not temporary.'" *Id.* (quoting *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983)). Danielle also has the burden to "prove a superior ability to minister to the needs of the child[]." *Id.*

The district court concluded that neither element was proved, ruling, "Many of the issues Danielle raised existed at the time the Decree was entered or pre-dated the Decree in 2015." We disagree. Rocky's diagnosis of post-traumatic stress disorder (PTSD) and his previous use of illegal drugs, such as methamphetamine, were known at the time of dissolution. But Rocky and J.M. moved homes several times in the five years between the dissolution and the

modification trial, and J.M. was forced to attend three different schools as a result. Plus, Rocky originally lived only a short distance from Danielle at the time of the dissolution—about four miles—but he and J.M. lived approximately a one-hour drive away at the time of the modification trial. *See Thorpe v. Hostetler*, 949 N.W.2d 1, 5–7 (Iowa Ct. App. 2020) (finding a substantial change in circumstances when one parent moved one-hour away after the original physical-care determination). With Danielle having visits with J.M. three weeknight evenings each week, this required the child to spend two hours in a vehicle each Monday, Wednesday, and Friday evening.[4] *See id.* (noting "that the child travel[ed] an hour each way" and "[a]s the child ages and becomes more involved in extracurricular activities, the stress of the commute falls on the child disproportionately"). Likewise, the amount of time on the road is possibly doubled[5] for Danielle, who was ordered to provide all transportation to and from visits because Rocky did not have a driver's license.

And, although the decree called for the parents to communicate about important decisions, including the child's education, Rocky made the two school changes without weighing input from Danielle. *See Harris,* 877 N.W.2d at 440-41 (modifying custody when the parents cannot communicate or respect each other). Rocky's requirement that Danielle pick up and drop off the child at the townhouse community mailboxes instead of at the door of his home; his requirement that

---

[4] On the Fridays of Danielle's weekend with J.M., the time in the vehicle was likely split between one hour on Friday and one hour when J.M. was returned on Sunday.
[5] Danielle works as a construction inspector; the jobsites she works at are sometimes near J.M. and Rocky's home, which reduces the amount of extra time Danielle must drive to pick up J.M. for visits.

Danielle not call him, but only text; and his lack of flexibility with visitation is also concerning. *See id.* at 441 (noting the depth of animosity was not lost on the children who were troubled by the behavior and wished the parents would "get their act together").

With a focus on the educational concerns, we note J.M. has missed and been late for a substantial amount of school while in Rocky's care. In the 2016-2017 school year, J.M. missed twenty-three and one-half days of school and was tardy fifteen times. The next school year, she missed twelve days and was tardy thirty-one times. In 2018-2019, J.M. missed nine days of school and was tardy thirty-six times. Rocky testified the tardies were often "just . . . one minute late, two minutes late." But his repeated inability to get J.M. to school on time, coupled with reports J.M. asks school officials for food after arriving, is concerning. When DHS looked into J.M.'s absences in February 2017, J.M. reportedly told the social worker she is late to school "a lot" because "me and dad are lazy." But we think what looks like "laziness" to a small child is more likely the result of Rocky's PTSD, which he testified manifests itself as anxiety, trouble sleeping, and depression. And while Rocky's diagnosis was known at the time of the dissolution decree, we cannot say the district court contemplated its possible negative impact on J.M.'s school attendance. *See Denson v. Capps*, No. 20-0774, 2021 WL 3075740, at *3 (Iowa Ct. App. July 21, 2021) (considering the parents' ability to get the child to school consistently in a modification action because the child "must consistently be in school to reap its benefits, which serve as the building blocks for her future").

Further, while the district court noted that many of the issues Danielle raised existed at the time of the 2015 decree, Rocky admitted to multiple relapses on

methamphetamine since the entry of the original decree. He was involved in an incident where he discharged a firearm, requiring law enforcement intervention and a hospitalization, all occurring when he was the primary caretaker for J.M. While he owns a home in Lacona, he moved a substantial distance from the mother due to his belief that he and J.M. were not safe in the home. He repeatedly accuses the mother of belonging to a gang, hacking his social media, and breaking into his home. All unproven. Since the original decree, he acknowledges driving with his daughter in the vehicle without a driver's license. Considering all of these circumstances, there has been a substantial change in circumstances since the entry of the dissolution decree.

Next, we must consider whether Danielle proved she has a superior ability to minister to the needs of the child. This is a closer call. Neither of these parents is perfect. Rocky continues to live with PTSD and the attendant difficulties that causes in his life. To his credit, he continues to seek outside, professional help as needed, and he relies on his support network when necessary. Rocky was also very forthcoming about his relapses[6] on methamphetamine and the treatment he sought to ensure those relapses were a one-time mistake rather than the beginning of a spiral back into addiction. It is clear that Rocky takes his struggles with mental health and substance abuse seriously, and he puts in the work to manage both while also being J.M.'s primary caretaker. We applaud his commitment to being a healthy adult so he can be a good, available parent to J.M. But we must also

---

[6] Rocky testified he has relapsed "[a] couple times" since the March 2015 decree. He did not know the exact dates of his relapses but believed the most recent relapse would have been "[o]ver a year and a half ago . . . maybe close to two" years before the modification trial.

consider how Rocky's mental health has impacted his parenting of J.M. *Cf. In re D.H.*, No. 18-1552, 2019 WL 156668, at *2 (Iowa Ct. App. Jan. 9, 2019) ("[A] parent's mental health is a factor that should be considered when evaluating the parent's ability to care for his or her child.").

Rocky testified his frequent change of home—including his intentional move to a one-hour distance from Danielle's home—is related to his belief that his previous home was "broken into . . . over a hundred" times. Rocky has accused Danielle of perpetrating at least some of the break-ins, which Danielle denied doing during her testimony at the modification trial. The district court made no findings as to Rocky's belief his home has been repeatedly broken into nor his allegations against Danielle. But on our review, we note that no credible evidence supports Rocky's assertions. By his own admission, he never reported a single break-in to law enforcement. And when asked directly if he had any evidence Danielle broke into his home, Rocky testified, "No evidence." Plus a witness called by Danielle who knows both Danielle and Rocky testified that Rocky once confronted him at a local gas station and, out of nowhere, accused the acquaintance of hacking his computer. Additionally, J.M.'s maternal grandmother, who Danielle lives with, testified that when she was unable to reach Rocky through text message, she called him to say she had arrived to pick up J.M. for a visit. Rocky's response to being called was to tell her not to threaten him. The grandmother was asked, "Has [Rocky] ever accused or made allegations that you are or have harmed him?" and she responded, "Well, yes, but I just ignore that." Rocky has made several decisions, including the location of J.M.'s home and school and the time she can spend with her maternal family members, based on his belief he is being targeted

and in danger. But there is no evidence his belief is supported by facts.[7] We cannot ignore the impact his apparent paranoia is having on J.M.[8]

As we already alluded, Danielle has her own issues that impact her parenting. Like Rocky, she has a history of using methamphetamine. And the man to whom she was married at the time of the modification trial, with whom she shared a then-two-year-old child, was actively addicted to methamphetamine and experiencing his own issues involving DHS. But Danielle had filed for divorce from her husband and she testified that he had not lived with her and their child since June 2019. This testimony was corroborated by Danielle's mother, with whom Danielle and her other child live. Danielle has lived in the same home with her parents since the original decree was entered in 2015 and she testified she has no intention to leave; she is "going to end up owning" the acreage in the future.

As the district court recognized, "Danielle's circumstances have improved since the Decree. She has maintained consistent employment and sobriety." Danielle is employed as an inspector for construction jobsites. She sometimes works longs days—testifying she has had to be at a jobsite by 4:30 a.m.—and does not always receive much notice before she is required to work an extended shift. But the maternal grandparents have been able to help transport J.M. so Danielle

---

[7] Yet, in a 2017 DHS report investigating the allegation that Rocky had the six-year old child shoot a BB gun at "monsters," Rocky told the investigator that "[h]e moved into [his mother's] home due to concerns for his own mental health and ongoing sobriety. He stated that living in the country, away from his family, he struggled with maintaining sobriety and keeping his mental health in good standing."

[8] As it pertained to his decision to move to West Des Moines, Rocky testified: "It was driving me crazy. I couldn't—I couldn't live life with all the break-ins and all the threats. It was affecting my daughter. She was having nightmares all the times about robbers."

does not miss her visits, and Danielle testified her mother would be able to help out with J.M. before and after school if Danielle's job required her to be away.

In deciding whether Danielle has shown she can offer superior parenting, we are being asked extrapolate into the future. This is not an easy task, but our case law tells us "[t]he past is prologue." *In re Marriage of Hoffman*, 867 N.W.2d 26, 43 (Iowa 2016) (Waterman, J., dissenting). The stability Danielle has shown with her job and her home and the built-in support of her parents, with whom she lives,[9] convinces us Danielle can more effectively administer to J.M.'s needs.

Because there has been a substantial change in circumstances since the entry of the dissolution decree and we are convinced Danielle can offer superior parenting, we modify the decree to give Danielle physical care of J.M.

**B. Child Support.**

Danielle challenges the child-support obligation, arguing the district court wrongly imputed income to her in making its calculation. Because we modify physical care, the prior child-support obligation must be changed. We remand to the district court to recalculate the obligation based on the change in physical care and the parties' financial circumstances at the time of recalculation. *See id.* at 37. The district court should also determine who will best benefit from the tax exemption related to the child as a part of the child-support calculation.

---

[9] We view the relationship between J.M. and her grandparents as a positive; we note the 2015 decree provided for "[a]t least once each month" visitation between the maternal grandparents and J.M., which was separate and apart from Danielle's parenting time with J.M.

**C. Appellate Attorney Fees.**

Danielle asks for appellate attorney fees. "In a proceeding for the modification of an order or decree under this chapter the court may award attorney fees to the prevailing party in an amount deemed reasonable by the court." Iowa Code § 598.36 (2019). While Danielle has been successful on appeal, she earns substantially more than Rocky, who receives limited income from his military disability. We decline to award Danielle appellate attorney fees.

**IV. Conclusion.**

We disagree with the district court; we conclude Danielle proved a substantial change in circumstances since the entry of the original decree and a superior ability to minister to the needs of the child. Therefore, we modify the decree to award Danielle physical care of J.M. We remand for the recalculation of child support and a determination of the allocation of the tax exemption based on this change. We decline to award Danielle appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED.**